CARELLA, BYRNE, CECCHI, BRODY
  & AGNELLO, P.C.
JAMES E. CECCHI
KEVIN G. COOPER
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

Local Counsel for Plaintiffs


UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| BARBARA STROUGO, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>   vs.<br><br>MALLINCKRODT PUBLIC LIMITED COMPANY, et al.,<br><br>              Defendants. | No. 3:20-cv-10100-RK (TJB)<br><br>CLASS ACTION<br><br>DECLARATION OF MICHAEL G. CAPECI IN SUPPORT OF: (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, EXPENSES, AND AWARDS TO PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4) |

4905-3886-5698.v1

I, MICHAEL G. CAPECI, am an attorney duly licensed to practice law in the State of New York, and have been admitted *pro hac vice* to practice in this Court, and declare as follows:

1.    I am a partner of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), the Court-appointed Lead Counsel for Lead Plaintiff Canadian Elevator Industry Pension Trust Fund ("Lead Plaintiff" or "Canadian Elevator") and named plaintiff City of Sunrise Police Officers' Retirement Plan ("Sunrise," and together with Canadian Elevator, "Plaintiffs") in this action (hereinafter the "Litigation.").[1]  I have been actively involved in the prosecution of the Litigation, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision of, and participation in, all material aspects of the Litigation.

2.    I respectfully submit this declaration in support of: (a) Plaintiffs' motion for final approval of the all-cash settlement of $46,000,000 (the "Settlement Amount"), on behalf of the Class, and for approval of the proposed Plan of Allocation; and (b) Lead Counsel's motion for an award of attorneys' fees, expenses, and awards to Plaintiffs pursuant to 15 U.S.C. §78u-4(a)(4).

---

[1]  Capitalized terms not defined herein have the meaning ascribed to them in the Stipulation of Settlement, dated September 18, 2024 (ECF 148-4) (the "Stipulation").

- 1 -

## I.   PRELIMINARY STATEMENT

3.     The Litigation against Mallinckrodt plc ("Mallinckrodt" or the "Company"), and the Individual Defendants, Mark C. Trudeau, Bryan M. Reasons, George A. Kegler, Matthew K. Harbaugh, Kathleen A. Schaefer, Angus C. Russell, Melvin D. Booth, JoAnn A. Reed, Paul R. Carter, and Mark J. Casey (the "Individual Defendants"), was brought on behalf of the Class for alleged violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).[2]

4.     This Settlement is the product of over five years of diligent litigation by Plaintiffs to obtain a very good recovery for Mallinckrodt investors of $46 million despite the Company twice filing for bankruptcy during that time, and Mallinckrodt and certain of the Individual Defendants convincing the SEC to assess a $0 monetary penalty in the SEC Action (defined below) for engaging in some of the alleged misconduct at issue in the Litigation.  The Settlement was achieved after two all-day mediation sessions and subsequent negotiations, and only after Lead Counsel, *inter alia*: (i) successfully in large part defeated the Individual Defendants' motion to

---

[2]   As discussed *infra*, on October 12, 2020, Mallinckrodt filed a Chapter 11 bankruptcy petition, and as a result of the discharge obtained therein, is no longer a defendant in the Litigation.  ECF 104.

- 2 -

4905-3886-5698.v1

dismiss; (ii) successfully achieved Sunrise's intervention in the Litigation as a named plaintiff to resolve potential standing arguments Defendants could have asserted; (iii) completed class certification discovery, including depositions of Canadian Elevator and Sunrise and each parties' experts; (iv) exchanged full class certification briefing with counsel for Defendants; (v) reviewed all of the documents produced by the Individual Defendants, Mallinckrodt, and third parties in fact discovery (comprising approximately 171,000 documents and 1,168,000 pages); (vi) navigated the Class's claims against Defendants through Mallinckrodt's two bankruptcy proceedings (in 2020 and 2023); and (vii) retained and consulted with experts in connection with class certification and in anticipation of further expert discovery.

5.      The Settlement provides a significant recovery to the Class, given the nature of the allegations, the size of investors' estimated losses, and the financial reality that Plaintiffs were litigating against ten Individual Defendants and were precluded from continuing to assert claims against Mallinckrodt.  As set forth below, the Settlement takes into consideration the significant risks the Litigation faces, including, for example, failing to obtain class certification or losing at summary judgment against the ten Individual Defendants.  The Settlement is the product of Plaintiffs' and Lead Counsel's vigorous litigation of the claims since inception, comprehensive investigation and analyses, and extensive arm's-length negotiations

- 3 -

between the Settling Parties, which took place after two mediation sessions and ongoing negotiations supervised by David M. Murphy (of Phillips ADR), an experienced and highly-regarded mediator.

6. Lead Counsel prosecuted this Litigation on a wholly contingent basis and has advanced and incurred substantial, albeit reasonable, litigation charges, costs, and expenses. In doing so, Lead Counsel faced the major risk of an unfavorable result and no compensation for its efforts.

7. The fee application of one-third (33-1/3%) of the Settlement Fund is fair, reasonable, and within the range of fee percentages frequently awarded in this type of action. Indeed, the fee request here was approved by Canadian Elevator and Sunrise. Under the facts and circumstances of this Litigation, the requested fee percentage is justified in light of the substantial benefits conferred on the Class, the risks undertaken on a contingency basis, the quality of the representation, and the extent of legal services performed.

8. Lead Counsel further seeks an award of expenses totaling $970,949.13 that were reasonably and necessarily committed to prosecuting the Litigation. This amount includes: (a) costs associated with traveling and defending the depositions of Canadian Elevator, Sunrise, and Plaintiffs' class certification expert; (b) costs associated with traveling and taking the deposition of the Individual Defendants' rebuttal expert on class certification; (c) costs associated with court reporter and

- 4 -

4905-3886-5698.v1

videographer fees; (d) fees and expenses of consultants and experts whose services Lead Counsel required in prosecuting the Litigation; (e) fees, expenses, and other costs associated with Lead Counsel's investigative efforts; (f) costs associated with photocopying, imaging, shipping, and managing hundreds of thousands of documents stored in an online repository; (g) factual and legal research; and (h) fees and expenses associated with retaining bankruptcy counsel during Mallinckrodt's two bankruptcy proceedings. These charges and expenses were reasonable and necessary to obtain the successful result reached in the Settlement.

9. Additionally, Canadian Elevator seeks an award of $10,000, and Sunrise seeks an award of $8,250, as provided by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), in connection with their representation of the Class. As described in Plaintiffs' accompanying declarations, Plaintiffs expended considerable time and effort in prosecuting the Litigation – efforts that were crucial to the Settlement.

10. The following is a summary of principal events that occurred during the course of the Litigation and the legal services provided by Lead Counsel.

## II.   THE LITIGATION

### A.   Commencement of the Litigation and Appointment of Lead Plaintiff and Lead Counsel

11. On July 26, 2019, the initial complaint was filed by Barbara Strougo ("Strougo") in the United States District Court for the Southern District of New York

- 5 -

(the "New York Court") against Mallinckrodt, Matthew K. Harbaugh, George A. Kegler, Bryan M. Reasons, and Mark C. Trudeau. ECF 4. The initial complaint alleged a class period of February 28, 2018 to July 16, 2019, inclusive.

12.    On September 24, 2019, Dennis Dauenhauer moved to serve as lead plaintiff. ECF 14. Brad Davis and Timothy Wilcox also separately moved to be appointed lead plaintiff. ECFs 19-20. That same day, Canadian Elevator moved to be appointed Lead Plaintiff and to appoint Robbins Geller as Lead Counsel. ECF 23. Delbert Smith moved to be appointed lead plaintiff as well. ECF 26. Strougo did not make a lead plaintiff application.

13.    On October 8, 2019, Canadian Elevator opposed the competing lead plaintiff motions. ECF 33.

14.    On October 15, 2019, Canadian Elevator informed the New York Court of its unopposed motion for appointment as Lead Plaintiff and approval of Robbins Geller as Lead Counsel. ECF 37. Following this filing, Lead Counsel continued its investigation into the underlying alleged misconduct that was eventually detailed in the Amended Complaint and Demand for Jury Trial (the "Amended Complaint").

15.    On June 25, 2020, the New York Court appointed Canadian Elevator as Lead Plaintiff and Robbins Geller as Lead Counsel. ECF 42.

4905-3886-5698.v1

**B.    Transfer to New Jersey**

16.    On July 9, 2020, as Lead Counsel was preparing the Amended Complaint, Lead Plaintiff wrote a letter to the New York Court requesting a pre-motion conference to discuss Lead Plaintiff's intention to move to transfer the Litigation to the United States District Court for the District of New Jersey.  ECF 43.  Defendants did not oppose the motion.  *Id.*

17.    On July 30, 2020, the New York Court granted Lead Plaintiff's letter request and transferred the Litigation to the United States District Court for the District of New Jersey.  ECF 44.

**C.    Lead Counsel's Investigation and Filing of the Amended Complaint**

18.    Before filing the Amended Complaint, and beginning when Lead Plaintiff alerted the New York Court in October 2019 that the lead plaintiff motion was unopposed, Lead Counsel conducted an extensive investigation into the alleged securities law violations at issue.

19.    Lead Counsel's investigation included, but was not limited to, reviewing and analyzing: (i) Mallinckrodt's public filings with the SEC; (ii) transcripts of Mallinckrodt's public conference calls; (iii) Mallinckrodt's press releases; (iv) reports of securities analysts and independent media reports; (v) economic analyses of Mallinckrodt stock price movement and pricing and volume data; and (vi) government investigations into Mallinckrodt; and (vii) other publicly

available information including the allegations set forth in the following lawsuits: (1) *Mallinckrodt ARD LLC v. Verma, et al.*, No. 1:19-cv-01471-TFH (D.D.C.); (2) *Mallinckrodt ARD LLC v. Verma, et al.*, No. 20-5154 (D.C. Cir.); (3) *Landolt v. Mallinckrodt ARD LLC*, No. 1:18-cv-11931-PBS (D. Mass.); (4) *U.S. ex rel. Strunck v. Mallinckrodt ARD LLC*, No. 2:12-cv-0175-BMS (E.D. Pa.); and (5) *U.S. ex rel. Clark v. Mallinckrodt ARD LLC*, No. 2:13-cv-1776-BMS (E.D. Pa.).

20.    As a result of Lead Counsel's comprehensive investigation, Lead Counsel filed the Amended Complaint on August 10, 2020, alleging that Mallinckrodt and the Individual Defendants – Mark C. Trudeau, Matthew K. Harbaugh, George A. Kegler, Bryan M. Reasons, Kathleen A. Schaefer, Angus C. Russell, Melvin D. Booth, JoAnn A. Reed, Paul R. Carter, and Mark J. Casey – violated §§10(b) and 20(a) of the Exchange Act during the period from May 3, 2016 and March 18, 2020, inclusive (the "Class Period").  ECF 56.  Lead Counsel prepared the Amended Complaint on behalf of Mallinckrodt investors who purchased or otherwise acquired Mallinckrodt common stock during the Class Period and were damaged thereby, and substantially added to and amplified the claims alleged in the initial complaint.

**D.    The Amended Complaint and a Summary of the Class's Allegations**

21.    The Amended Complaint significantly expanded upon the allegations of the initial complaint, and alleges that Mallinckrodt and the Individual Defendants

4905-3886-5698.v1

made materially false and misleading statements and omissions concerning H.P. Acthar Gel ("Acthar"), Mallinckrodt's single most profitable drug before and during the Class Period.  ECF 56.

22.    Specifically, the Amended Complaint alleges that the Centers for Medicare and Medicaid Services ("CMS") had repeatedly informed Mallinckrodt that it was knowingly using the wrong base date average manufacturer's price ("AMP") for calculating the Medicaid rebate the Company owed CMS each quarter since Mallinckrodt acquired Acthar in August 2014.  To avoid paying the government the rebates Mallinckrodt actually owed, the Amended Complaint alleges that the Individual Defendants knowingly, or recklessly, used the wrong base date AMP so that CMS incorrectly believed that Mallinckrodt owed a substantially lower amount of rebates.  As a result of this scheme as alleged, Mallinckrodt avoided paying over $600 million in rebates, which artificially boosted the Company's profits during the Class Period.

23.    As a result of the alleged scheme, the Amended Complaint alleges that the Individual Defendants made a series of false and misleading statements across four categories: (1) failing to disclose that Mallinckrodt was using the incorrect base date AMP during the Class Period to avoid paying rebates Mallinckrodt owed to CMS for Acthar; (2) issuing false guidance for Acthar for fiscal year 2019 in excess of $1 billion despite knowing such result was impossible given the liability

- 9 -

associated with illegally avoiding paying rebates to CMS; (3) failing to disclose the existence of the *Strunck* litigation and related intervention by the Department of Justice which was a whistleblower case regarding illegal marketing practices for Acthar; and (4) failing to disclose that Acthar clinical trials were being conducted to find new revenue sources for Acthar in light of the alleged CMS rebate scheme.

24.    The Amended Complaint alleges that investors learned about the Individual Defendants' materially false and misleading statements and omissions through a series of corrective disclosures on: (i) April 30, 2019; (ii) May 21, 2019; (iii) August 6, 2019; (iv) March 3, 2020; and (v) March 16, 2020, each of which caused the price of Mallinckrodt stock to precipitously decline.

25.    The Amended Complaint alleges that on April 30, 2019, CNN issued a news story about the *Strunck* litigation and investors learned for the first time about the existence of the *Strunck* complaint and that the Department of Justice had intervened in the case.  Mallinckrodt common stock declined $3.03 per share, or approximately 16.5%, as a result.

26.    On May 21, 2019, Mallinckrodt filed a Form 8-K announcing that the Company had filed a lawsuit against CMS and disclosed for the first time that CMS believed the Company owed the U.S. government hundreds of millions of dollars in Acthar rebates.  In response, Mallinckrodt common stock dropped $3.80 per share, or 29.1%.

- 10 -

27.    The Amended Complaint further alleges that on August 6, 2019, Mallinckrodt reported that it would not achieve its guidance for fiscal year 2019, and the Company's common stock declined $0.84 per share, or approximately 12.9%.

28.    On March 3, 2020, the Department of Justice issued a press release disclosing that Mallinckrodt's use of the wrong base date AMP exposed it to False Claims Act liability from a whistleblower and the government.    In response, Mallinckrodt common stock declined $1.07 per share, or 25.5%.

29.    Finally, the Amended Complaint alleges the last corrective disclosure occurred on March 16, 2020, when Mallinckrodt issued a Form 8-K and disclosed that the Company's lawsuit against CMS had been dismissed on summary judgment, meaning that CMS had been awarded an approximate $600 million judgment against the Company.    In response, Mallinckrodt common stock declined $1.96 per share, or approximately 64.4%.

### E.    Defendants' Motion to Dismiss

30.    Following the alleged final corrective disclosure on March 16, 2020, various news reports indicated that Mallinckrodt was facing a liquidity crisis as a result of the judgment CMS obtained, as well as the Company's various liabilities related to the ongoing national opioid epidemic.

31.    Nonetheless, the Litigation proceeded, and on October 1, 2020, Mallinckrodt and the Individual Defendants moved to dismiss the Amended

- 11 -

4905-3886-5698.v1

Complaint, which argued, among other things, that Plaintiffs: (1) failed to allege a strong inference of scienter; (2) relied on insufficient allegations from related government investigations and lawsuits; (3) failed to allege that statements related to the fiscal year 2019 guidance were made with knowledge; (4) failed to allege that Mallinckrodt's financial statements violated Generally Accepted Accounting Principles ("GAAP"); and (5) failed to allege any actionable omission. ECF 79. Mallinckrodt's and the Individual Defendants' motion to dismiss the Amended Complaint also attached 34 exhibits.

32. As described below, on October 12, 2020, Mallinckrodt filed for Chapter 11 bankruptcy. Nonetheless, because no stay had been ordered by the bankruptcy court at this time for the Individual Defendants, on November 16, 2020, following extensive factual and legal research, Lead Plaintiff filed its memorandum in opposition to the motion to dismiss the Amended Complaint against the Individual Defendants only, which also attached five exhibits (the "Opposition Brief"). ECF 84. The Opposition Brief disputed the arguments in the motion to dismiss the Amended Complaint and explained why the Court should deny the motion and allow the Litigation to proceed to discovery.

33. The Opposition Brief highlighted how the Individual Defendants had knowledge, or reckless disregard, that the improper avoidance of Acthar rebates rendered false and misleading statements about Acthar's rebates, and why the

4905-3886-5698.v1

challenged statements about achieving its guidance for 2019, and Class Period financial statements, among other things, were adequately alleged as actionable misstatements and omissions. The Opposition Brief also detailed how the Individual Defendants knew Mallinckrodt was using the wrong base date AMP for Acthar and therefore was underpaying rebates the Company owed to CMS. Further, the Opposition Brief explains in detail the scienter allegations against each of the Individual Defendants.

### F. Mallinckrodt Files the Company's First Chapter 11 Bankruptcy Petition

34. As mentioned above, on October 12, 2020, Mallinckrodt filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). *See In re Mallinckrodt PLC, et al.*, No. 20-12522 (JTD) (D. Del.). The filing of a Chapter 11 bankruptcy petition automatically stayed the Litigation against Mallinckrodt.

35. In connection with Mallinckrodt's bankruptcy proceedings, the Company also instituted an adversary proceeding against, Lead Plaintiff, among others, to obtain a temporary stay of the Litigation against the Individual Defendants. *See Mallinckrodt PLC, et al. v. State of Connecticut, et al.*, Adv. Pro. No. 20-50850 (JTD) (D. Del.).

- 13 -

36.     On November 23, 2020, the Bankruptcy Court issued a temporary nine-month stay of the Litigation, and on December 10, 2020, the Court adopted the Bankruptcy Court stay and vacated the motion to dismiss.  ECF 89.

37.     Lead Plaintiff, through bankruptcy counsel retained by Lead Counsel, moved the Bankruptcy Court to reconsider the stay of the Litigation against the Individual Defendants.  On January 27, 2021, the Bankruptcy Court denied the motion.

38.     During the pendency of Mallinckrodt's Chapter 11 bankruptcy proceedings, Lead Plaintiff, through bankruptcy counsel, remained an engaged participant.  Lead Plaintiff was apprised of all ongoing bankruptcy proceedings and also participated in motion practice in the Bankruptcy Court.  On September 1, 2021, Lead Plaintiff filed an objection in the Bankruptcy Court, through its bankruptcy counsel, to the releases laid out in Mallinckrodt's proposed bankruptcy plan. Mallinckrodt and the debtors responded to the objection, and Lead Plaintiff filed a reply on December 21, 2021.

39.     As part of the Bankruptcy Court's hearings on confirming the proposed bankruptcy plan, Lead Plaintiff's bankruptcy counsel participated in several live examinations of witnesses to obtain testimony to support Lead Plaintiff's arguments on the releases.

40.    On February 3, 2022, the Bankruptcy Court entered Mallinckrodt's Modified Fourth Amended Joint Plan of Reorganization and overruled the objections set forth by Lead Plaintiff.

41.    On March 17, 2022, the debtors allowed the Bankruptcy Court's injunction in the adversary proceeding to be modified to permit the Litigation to continue against the Individual Defendants while the bankruptcy approval process continued.

42.    In response, on March 29, 2022, Judge Thompson reinstated the Litigation with respect to the Individual Defendants.  ECF 93.

43.    On April 19, 2022, the Litigation was reassigned to Judge Michael A. Shipp.  ECF 94.

44.    On May 2, 2022, the Individual Defendants filed their reply brief in support of the motion to dismiss.  ECF 95.  The Individual Defendants argued that Plaintiffs failed to allege particularized facts that the Individual Defendants acted with scienter, and that the Amended Complaint failed to allege an actionable false or misleading statement.

45.    While the Individual Defendants' motion to dismiss was pending, the parties engaged in further argument via letters to Judge Shipp.  ECFs 99-102.

- 15 -

46.     On December 14, 2022, Mallinckrodt was voluntarily dismissed without prejudice from the Litigation by virtue of the bankruptcy discharge that the Company obtained from the Bankruptcy Court.  ECF 104.

**G.     The Court Mostly Sustains the Amended Complaint**

47.     On December 16, 2022, Judge Shipp largely denied the Individual Defendants' motion to dismiss the Amended Complaint with the exception of Lead Plaintiff's Acthar clinical trial allegations.  ECF 105.  In sum, the Court found that the Amended Complaint adequately alleged a strong inference of scienter and found statements related to GAAP, fiscal year 2019 guidance, and the *Strunck* litigation actionable.  The Court also found that Lead Plaintiff stated a claim for control person liability under Section 20(a) of the Exchange Act.

48.     On January 17, 2023, the Individual Defendants filed their Answer to the Amended Complaint.  ECF 108.

49.     On January 31, 2023, Magistrate Judge Bongiovanni ordered a scheduling conference for March 20, 2023.  ECF 113.

**H.     Discovery**

50.     Plaintiffs diligently pursued discovery in the Litigation.  After Judge Shipp largely sustained the allegations in the Amended Complaint, the parties met and conferred pursuant to Federal Rule of Civil Procedure 26(f) concerning case management, pre-trial scheduling, and fact discovery.

- 16 -

51.    On January 23, 2023, Lead Counsel sent counsel for the Individual Defendants a draft joint discovery plan via email.  That same day, the parties met and conferred regarding the proposed schedule.

52.    Lead Counsel also drafted a confidentiality order and ESI protocol and submitted it to counsel for the Individual Defendants via email on January 24, 2023.

53.    On January 26, 2023, the parties held another meet and confer to discuss the schedule and on January 27, 2023, the parties conferred via email and the Individual Defendants accepted Plaintiffs' counter proposal to the schedule.

54.    During the negotiations for the ESI protocol, Lead Counsel diligently discussed and consulted with its in-house ESI and information technology personnel. Lead Counsel also comprehensively reviewed and questioned the Individual Defendants' suggested edits and revisions to the ESI protocol.  Lead Counsel engaged in discussions about de-duplication, metadata, filtering, and other potential methods for searching and producing documents from ESI custodians.

55.    To that end, the parties also engaged in numerous negotiations regarding the use of search terms and custodian lists for the production of documents.  Lead Counsel engaged in detailed research to ensure that it was seeking documents from a relevant list of custodians from Mallinckrodt.  These efforts were meticulous, as Mallinckrodt was a huge company with multiple boards, subcommittees, hierarchies, and departments.  Lead Counsel and counsel for the

- 17 -

Individual Defendants also engaged in multiple meet and confer sessions to discuss search term strings for the production of documents.

### a. Initial Disclosures, Document Requests, and Meet and Confer Negotiations

56. On February 9, 2023, Lead Plaintiff served its Initial Disclosure Statement pursuant to the Case Management Plan. Lead Plaintiff identified a list of individuals and entities likely to have discoverable information supporting the Amended Complaint's allegations. To prepare this document, Lead Counsel reviewed its internal investigation files and public information regarding Mallinckrodt's corporate structure and employee hierarchy and SEC filings. Lead Counsel also reviewed relevant analyst reports to identify analyst firms and individuals therein who likely possessed knowledge about Mallinckrodt.

57. On February 13, 2023, the parties held another telephonic meet and confer to discuss the Individual Defendants' proposed edits to the confidentiality agreement and the ESI protocol. The parties engaged in further discussion on the ESI protocol and the confidentiality agreement to govern discovery in the Litigation during a February 24, 2023 meet and confer session.

58. On February 16, 2023, Lead Plaintiff served Plaintiff's First Set of Requests to Defendants for the Production of Documents, which contained 74 requests to the Individual Defendants pertinent to the Amended Complaint's allegations and the claims and defenses in the Litigation.

- 18 -

59.    The Individual Defendants also served document requests on Lead Plaintiff the same day.  On March 17, 2023, the parties exchanged responses and objections to each other's document requests.  The Individual Defendants objected to nearly every request for production on various grounds, including relevance, privilege, burden, over breadth, and vagueness, among others.

60.    On March 20, 2023, Lead Counsel attended the scheduling status conference via telephone before Magistrate Judge Bongiovanni.  Then, on March 24, 2023, the parties met and conferred via telephone regarding the parties' responses and objections to the document requests.  The parties continued these negotiations on March 30, 2023, March 31, 2023, and April 6, 2023.  Lead Plaintiff worked diligently to resolve these disputes without requiring judicial intervention and to ensure the production of documents would be done efficiently.

**b.    Third Party Discovery**

61.    Lead Counsel simultaneously pursued comprehensive third party discovery efforts in the Litigation and subpoenaed various individuals, accounting firms, and other third parties, most notably and importantly Mallinckrodt.  Lead Counsel spent a large amount of time and resources to locate and serve as well as negotiate document requests with third parties.  Lead Counsel subpoenaed documents and/or testimony from the following third parties:  Mallinckrodt, Ankura, Don Bailey, Barclays Capital, Centerview Partners, CMS, Deloitte, Department of

- 19 -

Justice, Ernst & Young, KPMG, James Landolt, Michael Mulroy, SEC, CIFC LLC, Eaton Vance Corp., First Eagle Investment Management, LLC, Octagon Credit Investors, LLC, and PGIM, Inc.  Lead Counsel engaged in meet and confer sessions and negotiated the production of documents with these entities or individuals based on their responses and objections to the production of documents.  Lead Counsel's diligent third party discovery efforts led to the production and review of thousands of documents (excluding the documents produced by Mallinckrodt).

62.    More specifically, Lead Counsel participated in a meet and confer session with Barclays Capital on September 26, 2023.  Lead Counsel negotiated with Barclays Capital and on December 8, 2023, Barclays Capital produced relevant documents to Lead Counsel.

63.    On September 20, 2023, Lead Counsel participated in a meet and confer with Ernst & Young, which agreed to reproduce productions it previously made to the Department of Justice and SEC.  Two days later, Ernst & Young produced relevant documents to Plaintiffs.

64.    Centerview Partners submitted responses and objections to Lead Counsel on September 27, 2023.  On October 5, 2023, Lead Counsel participated in a meet and confer with Centerview Partners.  After multiple correspondences with Centerview Partners, it made a production to Plaintiffs on December 8, 2023.

- 20 -

65.    Lead Counsel spoke with KPMG on September 22, 2023.  KPMG served Plaintiffs with responses and objections on September 27, 2023, and also made a production.  On October 12, 2023, at Lead Counsel's request, KPMG sent privilege logs as well.

66.    Deloitte served its responses and objections on September 18, 2023. Lead Counsel participated in a meet and confer session with Deloitte on September 27, 2023, and Deloitte agreed to reproduce a production it had previously made to the SEC.  Deloitte made a document production on October 24, 2023.  Lead Counsel also had another meet and confer session with Deloitte on February 28, 2024, regarding obtaining additional documents from a particular Deloitte custodian.

67.    Lead Counsel served a subpoena *duces tecum* on counsel for James Landolt, the whistleblower in the lawsuit brought by CMS against Mallinckrodt. Lead Counsel met and conferred with his counsel on October 10, 2023, and received a production on October 18, 2023.

68.    On January 19, 2024, Michael Mulroy's counsel, also counsel for the Individual Defendants, served responses and objections, and on February 28, 2024, counsel for Michael Mulroy served a letter with Bates numbers of documents previously produced from Michael Mulroy's files.

69.    On January 19, 2024, Don Bailey's counsel, also counsel for the Individual Defendants, served responses and objections, and on February 28, 2024,

- 21 -

counsel for Don Bailey served a letter with Bates numbers of documents previously produced from Don Bailey's files.

70.     On December 15, 2023, Lead Counsel served the Department of Justice and SEC with subpoenas.  The SEC sent correspondence on January 4, 2024, and Lead Counsel met and conferred with the SEC on January 9, 2024.  On January 16, 2024, the SEC informed Lead Counsel that it was willing to produce certain testimony and exhibits.  On April 9, 2024, the SEC produced documents and testimony from the SEC's investigation into Mallinckrodt regarding the alleged Acthar rebate scheme.

71.     On January 12, 2024, CMS served Plaintiffs with a letter stating it was treating the subpoena as a FOIA request and asked for more information.  Lead Counsel responded to that letter on January 16, 2024, and was awaiting further feedback from CMS at the time the Settlement was reached.

### c.     Mallinckrodt Files the Company's Second Chapter 11 Bankruptcy Petition

72.     During the middle of discovery, on August 28, 2023, Mallinckrodt filed a second Chapter 11 bankruptcy petition in the Bankruptcy Court.  *See In re Mallinckrodt PLC, et al.*, No. 23-11258 (JTD) (D. Del.).  Mallinckrodt filed this second Chapter 11 bankruptcy petition because the Company could not afford to pay back various creditor groups as required by the Bankruptcy Court at the conclusion of the first Chapter 11 bankruptcy.

4905-3886-5698.v1

73.    Lead Counsel again retained bankruptcy counsel to represent the interests of Plaintiffs and the Class in this second bankruptcy proceeding.

### d.    The SEC Action Against Mallinckrodt and Certain of the Individual Defendants

74.    At the beginning of discovery, in March 2023, Lead Counsel learned that the SEC had been investigating Mallinckrodt and certain of the Individual Defendants (the "SEC Action").  As part of the SEC Action, the SEC had issued Wells Notices to Mallinckrodt and various unnamed current and former Mallinckrodt executive officers in January 2023.  Lead Counsel immediately requested that Mallinckrodt and the Individual Defendants provide all materials related to these Wells Notices, including any briefing submissions and testimony.

75.    Lead Counsel received and reviewed multiple Wells submission briefs, letters to the SEC, and hundreds of thousands of pages of documents that Mallinckrodt produced in the SEC Action.

76.    The SEC Action involved similar allegations to the Amended Complaint, *i.e.*, Mallinckrodt's failure to disclose the potential liability for underpaying Acthar rebates, but was focused on a much narrower time frame that began in November 2018 and concluded with only the May 21, 2019 alleged partial corrective disclosure.  In other words, had Lead Plaintiff asserted in the Amended Complaint the same damages sought by the SEC in the SEC Action, the amount of damages at issue in this Litigation would have been significantly less.

- 23 -

77.    Upon review of the documents Mallinckrodt produced from the SEC Action, Lead Counsel worked swiftly to protect the interests of Lead Plaintiff and the Class.  With Lead Plaintiff's agreement and input, Canadian Elevator asked Sunrise to move to intervene in the Litigation as an additional named plaintiff. Adding Sunrise to the Litigation would protect the Class's interest in the entire Class Period as alleged in the Amended Complaint should the Court ultimately have adopted the relevant time frame in the SEC Action, which would have reduced the possible recovery for the Class.

78.    The SEC Action concluded on November 30, 2023, during the middle of discovery, when the SEC issued a Cease and Desist Order and made factual findings that Mallinckrodt failed to disclose its financial liability in excess of $500 million for underpaying CMS on Acthar rebates, and that Mallinckrodt failed to disclose a loss contingency in excess of $500 million pursuant to GAAP, for the November 2018 to May 2019 time period (the "SEC Order").

79.    In light of Mallinckrodt's two Chapter 11 bankruptcy filings and current financial condition, the SEC found that while a $40 million civil penalty was appropriate, the SEC would not assess any penalty if Mallinckrodt implemented a variety of compliance reforms.  Accordingly, the SEC Action resulted in the recovery of $0 from Mallinckrodt, and assessed no liability against any of the Individual Defendants.

- 24 -

### e. Sunrise Moves for Intervention in the Litigation

80.    During discovery, on May 15, 2023, the Litigation was reassigned to Judge Robert Kirsch.  ECF 117.

81.    On July 18, 2023, Lead Counsel advised Magistrate Judge Bongiovanni during a status conference that Sunrise intended to move for permissive intervention and join Canadian Elevator as an additional named plaintiff.  Counsel for the Individual Defendants initially protested Sunrise's addition in the Litigation, but ultimately decided not to oppose Sunrise's motion for intervention following the conference with Magistrate Judge Bongiovanni.

82.    On August 4, 2023, Sunrise moved for permissive intervention to join the Litigation as an additional named plaintiff.  On August 7, 2023, the Court granted Sunrise's motion for intervention and added it as a named plaintiff to the Litigation. ECFs 122-123.

83.    Lead Counsel prepared and produced Canadian Elevator's responsive documents to the Individual Defendants and prepared Canadian Elevator's representative, Gregory Manion, for a deposition.  On July 18, 2023, counsel for the Individual Defendants deposed Canadian Elevator's representative, Gregory Manion.

84.    Thereafter, Lead Counsel prepared and produced Sunrise's responsive documents to the Individual Defendants and prepared Sunrise's representative,

4905-3886-5698.v1

David Williams, for a deposition.  Counsel for the Individual Defendants deposed Sunrise's representative, David Williams, on August 17, 2023.

85.    The Individual Defendants and Mallinckrodt produced approximately 155,000 documents, and third parties produced over 16,000 documents, together comprising over 1,168,000 pages.  Lead Counsel diligently reviewed every single document, and was in the midst of preparing for fact witness depositions when the Settlement was reached.

### f.    Mallinckrodt's Privilege Logs

86.    In connection with Mallinckrodt's document productions, counsel for Mallinckrodt also produced hundreds of pages of privilege logs.  Lead Counsel diligently reviewed each entry in these privilege logs.

87.    On August 25, 2023, Plaintiffs informed Mallinckrodt that the privilege logs had improperly withheld thousands of documents.  As described below, Lead Counsel composed a letter to counsel for Mallinckrodt outlining the multiple categorical deficiencies within the privilege logs associated with Mallinckrodt's previous document productions to the Government.

88.    During the review of the privilege logs, Lead Counsel uncovered thousands of apparently improperly withheld, improperly redacted, and insufficiently described communications.  As such, Lead Counsel wrote to counsel

for Mallinckrodt informing them of these findings and requested that they produce the documents that were improperly withheld or revise the privilege logs.

89. Further, Lead Counsel identified numerous deficiencies implicating thousands of documents in Mallinckrodt's privilege logs. Lead Counsel identified categories of deficiencies including: inadequately described documents, non-legal communications, and communications where attorney-client privilege was waived. Along with this letter, Lead Counsel composed multiple exhibits extracted from these privilege logs and meticulously identified which deficiency Lead Counsel was raising with respect to each entry.

90. On October 3, 2023, Mallinckrodt responded to Plaintiffs' letter regarding the disputed privilege logs and disputed Plaintiffs' assertions. Indeed, Mallinckrodt argued that the privilege logs were wholly sufficient. The dispute over the privilege logs continued with more written correspondence and exhibits from both sides. Had the parties been unable to reach a settlement, Lead Counsel was ready to present these issues to Magistrate Judge Bongiovanni for resolution, as a hearing on this issue was scheduled at the time of the mediation, but was then later withdrawn in light of the Settlement.

### g.     Search Terms and Custodians

91. Also during discovery, Plaintiffs requested that Mallinckrodt and the Individual Defendants apply additional search terms for over 25 custodians during a

4905-3886-5698.v1

specified time period.  As a result of Lead Counsel's diligent and comprehensive review of hundreds of thousands of pages of documents, Lead Counsel believed there were material gaps in the document discovery produced to-date.

92.    Counsel for the Individual Defendants and Mallinckrodt refused this request for additional search terms and custodians and the parties were actively negotiating a solution at the same time as the privilege log dispute when the Settlement was reached.

### h.    Interrogatories and Remaining Discovery Disputes

93.    On February 16, 2023, the Individual Defendants served their first set of interrogatories to Lead Plaintiff asking for eight interrogatory responses.

94.    On March 17, 2023, Lead Plaintiff served responses and objections to the Individual Defendants' first set of interrogatories.  Lead Plaintiff provided accurate and full responses to certain of these interrogatories and also made necessary objections.

95.    Later on in discovery, on January 12, 2024, Plaintiffs served each of the ten Individual Defendants with their first set of interrogatories, which consisted of five sets of interrogatories.

96.    Nine of the Individual Defendants served responses and objections to these interrogatories on February 16, 2024.

- 28 -

97.     On February 21, 2024, Plaintiffs submitted a letter to Magistrate Judge Bongiovanni regarding the parties' discovery disputes, including: (i) Plaintiffs' intention to file a motion to compel Mallinckrodt to produce certain documents Plaintiffs had requested in their subpoena; (ii) Plaintiffs' request to increase the number of fact depositions; and (iii) Plaintiffs' request for a sur-reply in the class certification briefing.   ECF 132.   The Individual Defendants' positions were contained therein.

98.     On March 4, 2024, the parties informed the Court of their scheduled mediation session and the Court stayed the Litigation pending mediation on March 7, 2024.  ECF 136.

**I.      Class Certification**

99.     While the aforementioned fact discovery was ongoing, Plaintiffs simultaneously pursued class certification.  On May 29, 2023, Plaintiffs served the expert report of Dr. Steven P. Feinstein, Ph.D., CFA, which demonstrated that Mallinckrodt common stock traded in an efficient market during the Class Period and proposed a damages calculation method.

100.   On June 30, 2023, the Individual Defendants served the rebuttal report of Dr. Paul Zurek, Ph.D., which challenged the proposed damages calculation method that Plaintiffs intended to use.

4905-3886-5698.v1

101.    Counsel for the Individual Defendants deposed Dr. Feinstein on July 27, 2023.  Before the deposition, Lead Counsel helped Dr. Feinstein prepare for his deposition.

102.    On August 8, 2023, Lead Counsel deposed Dr. Zurek.

103.    On August 10, 2023, Plaintiffs served their opening motion for class certification on the Individual Defendants.

104.    On August 21, 2023, Plaintiffs served the Individual Defendants with Dr. Feinstein's reply expert report in further support of class certification.

105.    Also on August 21, 2023, Plaintiffs moved to exclude the rebuttal report of Dr. Zurek, arguing that he included unreliable legal opinions in his rebuttal report.

106.    On October 10, 2023, the Individual Defendants opposed Plaintiffs' motion for class certification.

107.    On December 22, 2023, the Individual Defendants opposed Plaintiffs' motion to exclude Dr. Zurek.

108.    Shortly thereafter, the parties agreed to engage in settlement discussions.  The Litigation was stayed pending the parties' mediation efforts, and class certification was not fully briefed as a result.  ECF 136.  Nonetheless, Lead Counsel had prepared drafts of the class certification reply brief and motion to exclude reply brief in the event that the mediation efforts were unsuccessful and the Litigation resumed.

- 30 -

### J.     Consultants and Experts

#### a.     Dr. Steven P. Feinstein, Ph.D., CFA

109.   During the Litigation, Lead Counsel retained certain consultants to assist with the various nuances alleged in the Amended Complaint and presented during discovery.  Lead Counsel retained the services of Dr. Steven P. Feinstein, Ph.D., CFA for purposes of Plaintiffs' motion for class certification.

110.   Dr. Feinstein prepared a report which Plaintiffs served with their motion for class certification.  Dr. Feinstein's report detailed market efficiency and proposed a damages methodology used to calculate damages for the Class. Dr. Feinstein was deposed by counsel for the Individual Defendants and also submitted a reply report.  Dr. Feinstein also prepared the proposed Plan of Allocation for the Settlement.

#### b.     Mr. D. Paul Regan, CPA/CFF

111.   Plaintiffs also utilized the consulting services of Mr. D. Paul Regan, a certified public accountant specializing in financial forensics.  Mr. Regan is employed by Hemming Morse, LLP, Certified Public Accountants, Forensic and Financial Consultants.  Mr. Regan has been a CPA since 1970 and has provided accounting or auditing services in more than 1,000 complex litigation matters.

4905-3886-5698.v1

112.   Plaintiffs utilized Mr. Regan's services to help Lead Counsel navigate through the Individual Defendants' arguments concerning the GAAP ASC 450 and its application to Acthar's rebates to CMS.

### c.      Mr. Louis Rossiter

113.   Plaintiffs also utilized the consulting services of Mr. Louis Rossiter, a Professor at The College of William & Mary.  Mr. Rossiter is employed by Vega Economics.  Mr. Rossiter has served as an expert in numerous proceedings on matters related to CMS and the FDA.

114.   Plaintiffs utilized Mr. Rossiter's services to help Lead Counsel navigate the Medicaid Drug Rebate Program and Acthar's participation in that program.

### d.      Eiseman Levine

115.   Lead Plaintiff, through Lead Counsel, retained the services of Eiseman Levine Lehrhaupt & Kakoyiannis, P.C. ("Eiseman Levine") to serve as primary bankruptcy counsel for Lead Plaintiff and the Class in Mallinckrodt's first bankruptcy proceeding and in the adversary proceeding that Mallinckrodt brought against, among others, Lead Plaintiff.

116.   Among other things, Eiseman Levine drafted and filed numerous briefs in Mallinckrodt's first bankruptcy proceeding, and gave oral argument and conducted live witness examinations in connection with this proceeding.

- 32 -

### e.    Joyce

117.    Lead Plaintiff, through Lead Counsel, and at the recommendation of Eiseman Levine, retained the services of Joyce, LLC ("Joyce") to serve as local Delaware bankruptcy counsel for Lead Plaintiff and the Class in Mallinckrodt's first bankruptcy proceeding and in the adversary proceeding that Mallinckrodt brought against, among others, Lead Plaintiff.

118.    Among other things, Joyce ensured compliance with, and provided advice regarding, Delaware local practice in connection with Mallinckrodt's first bankruptcy proceeding.

### f.    Lowenstein

119.    Plaintiffs, through Lead Counsel, retained the services of Lowenstein Sandler LLP ("Lowenstein") to serve as bankruptcy counsel for Plaintiffs and the Class in Mallinckrodt's second bankruptcy proceeding and as consulting bankruptcy counsel for purposes of the mediations that resulted in the Settlement.

120.    Among other things, Lowenstein represented Plaintiffs' interests in Mallinckrodt's second bankruptcy proceeding, and provided input and advice on the mediation statements and participated in the mediation sessions.

### K.    Mediation

121.    As discovery was ongoing, on March 21, 2024, Plaintiffs and the Individual Defendants participated in a voluntary and confidential in-person

4905-3886-5698.v1

mediation session with David M. Murphy (of Phillips ADR), an experienced mediator.

122.   Before the mediation session, the parties submitted comprehensive opening and reply mediation statements.

123.   During the in-person mediation session, the parties engaged in thorough, good-faith negotiations overseen and assisted by Mr. Murphy.  Despite these efforts, the parties were unable to arrive at an agreement.

124.   On May 23, 2024, Plaintiffs and the Individual Defendants attended another in-person mediation session before Mr. Murphy and again engaged in good-faith negotiations.  Still, however, the parties' negotiations did not ultimately lead to a settlement.

125.   After the two mediation sessions, the parties engaged in further negotiations with the assistance of the mediator, and on June 7, 2024, following additional settlement discussions, the Settling Parties accepted the mediator's proposal to settle the Litigation in return for a cash payment of $46 million to be paid by the Individual Defendants and/or their insurers for the benefit of the Class.

**L.    Preliminary Approval of the Settlement**

126.   On September 18, 2024, Plaintiffs filed their unopposed motion for preliminary approval of class action settlement and approval of notice to the Class. ECF 148.  Plaintiffs requested preliminary approval of the Settlement, certification

- 34 -

4905-3886-5698.v1

of the Class for settlement purposes, approval of the manner and form of notice to Class Members, and a hearing to consider the proposed Settlement, proposed Plan of Allocation, and Lead Counsel's application for an award of attorneys' fees and litigation expenses.

127.  On December 9, 2024, the Settling Parties consented to jurisdiction by Magistrate Judge Bongiovanni to decide Plaintiffs' motion for preliminary approval. ECF 150.

128.  On December 20, 2024, Magistrate Judge Bongiovanni held a preliminary approval hearing via Microsoft Teams.

129.  On December 23, 2024, Magistrate Judge Bongiovanni granted the motion for preliminary approval.  ECF 155.

## III.    THE SETTLEMENT

### A.    The Settlement Was Fairly, Honestly, and Aggressively Negotiated by Counsel Who Endorse the Settlement

130.  The Settlement was the result of comprehensive and efficient efforts and arm's-length negotiations between the Settling Parties with the assistance of Mr. Murphy, an experienced mediator.  The Settlement of $46 million is representative of an evaluation of the strengths and weaknesses of the Litigation, and would not have been possible without Lead Counsel's diligent efforts.

- 35 -

4905-3886-5698.v1

131.    The Settlement is a positive and favorable result for the Class especially considering the risks of complex, expensive, and lengthy continued litigation. Indeed, the size of the recovery here strongly supports approving the Settlement.

**B.    The Settlement Eliminates the Risks and Any Potential Delay of Relief for Plaintiffs and the Class**

132.    Lead Counsel pursued diligent and comprehensive investigations throughout the duration of the Litigation – from drafting the allegations in the Amended Complaint, opposing the Individual Defendants' motion to dismiss, representing the Class's rights during Mallinckrodt's bankruptcy proceedings, aggressively pursuing discovery and document review, and diligently managing the ten Individual Defendants, Mallinckrodt, numerous third parties, and a government investigation.

133.    Indeed, Lead Counsel and Plaintiffs have a strong understanding of the strengths and weaknesses of the Litigation because they left no stone unturned when prosecuting the Litigation through discovery.

134.    As a result of the Settlement, Plaintiffs avoid the significant costs and expenses associated with further litigation of this complex securities class action, including at summary judgment and during a jury trial.    The Settlement is fair, reasonable, and adequate, especially in light of the significant risks as detailed below, and Lead Counsel respectfully submits that the Settlement warrants the Court's final approval.

- 36 -

135. After the Settling Parties agreed upon the broad settlement terms, they documented the Settlement and Lead Counsel prepared preliminary settlement approval papers. The Settling Parties diligently worked together to negotiate the details of the Stipulation, Plan of Allocation, and notices to the Class.

## C. The Risks of Continued Litigation Favor Settlement

### a. Establishing Scienter Against Each of the Ten Individual Defendants

136. While Judge Shipp largely denied the Individual Defendants' motion to dismiss the Amended Complaint, Plaintiffs appreciate that there are a multitude of risks inherent in continuing the Litigation.

137. Since Mallinckrodt is no longer a defendant in the Litigation, Plaintiffs would bear the burden of proving that each of the ten Individual Defendants made materially false and misleading statements. Proceeding to summary judgment and jury trial without a corporate defendant has its own nuances and would prove challenging.

138. Further, Plaintiffs would have to prove that each of the ten Individual Defendants possessed the requisite scienter in making these allegedly false or misleading statements. Such burden is a heavy one. Although Plaintiffs are confident in their ability to prove scienter, the Individual Defendants were as adamant that Plaintiffs could not do so. It is possible for a jury to decide that none

- 37 -

or only a few of the Individual Defendants acted with scienter and such finding would be to the detriment of Plaintiffs' case.

### b.    Proving the Individual Defendants Violated Accounting Standard ASC 450

139.    The Individual Defendants would also maintain that they did not violate GAAP, or ASC 450, specifically.    Throughout the Litigation and discovery, the Individual Defendants have relentlessly argued about the meaning of ASC 450 and its applicability to the Acthar base date AMP.    The Individual Defendants would continue to argue that they did not violate ASC 450.    Lead Counsel's conversations with counsel for Deloitte confirmed that Deloitte was prepared to testify in favor of the Individual Defendants on this issue.    Effectively, whether Defendants violated ASC 450 would be subject to expert testimony and the inherent uncertainties of which side's expert would be more persuasive to the Court and the jury.

### c.    Resolving the Parties' Dispute over the Privilege Logs

140.    Plaintiffs' dispute over the reliability of third-party Mallinckrodt's extensive privilege logs would continue to be a main point of contention in the Litigation.    Mallinckrodt's privilege logs contained thousands of entries and Plaintiffs disputed the grounds on which Mallinckrodt claimed these documents were privileged.

- 38 -

141.    Plaintiffs and the Individual Defendants would also continue to dispute whether the Individual Defendants were in fact asserting an advice of counsel defense and its applicability to a plethora of allegedly privileged documents.  The outcome of the dispute over these privilege logs presented great risk to Plaintiffs' ability to prove their claims at trial against each Individual Defendant.  Even if these discovery disputes resolved in Plaintiffs' favor, there is no predicting how many more discovery disputes the parties would encounter.  Indeed, such disputes, if not resolved without intervention from the Court, would result in further delay and unpredictability.

### d.    Certifying the Class

142.    If the Litigation were to continue, Plaintiffs would also have to face the Individual Defendants' arguments on class certification – including that Plaintiffs' damages methodology was insufficient – in order to successfully certify the class. The Individual Defendants would also strongly defend their expert against Plaintiffs' *Daubert* motion.  A denial of Plaintiffs' motion for class certification or a shortening of the class period would negatively impact Plaintiffs' case and Class Members' ability to recover.

### e.    Succeeding at Summary Judgment and Trial

143.    Aside from these specific hurdles, Plaintiffs would also bear the burden of succeeding at summary judgment.  In light of the SEC Order, Plaintiffs expected

that the Individual Defendants would argue at summary judgment that the only possibly actionable class period was from November 2018 to May 2019, with one decline in May 2019. If this argument had been accepted by the Court, it would have greatly reduced the damages claimed by Plaintiffs and the Class.

144. And nonetheless, if the Litigation proceeded to a jury trial, while Plaintiffs are confident in their claims and would certainly support their claims with qualified expert testimony and evidence – jury reactions are impossible to predict. The Individual Defendants would also provide strong expert testimony and evidence to support their arguments before a jury.

145. Even if Plaintiffs were successful at trial, the Individual Defendants would likely spare no expense exhausting all appeals. The appellate process is extremely lengthy, unpredictable, and expensive. Without the Settlement, the Class remains entirely unprotected and faces a substantial risk of not recovering anything at all.

146. Continuing the Litigation would be arduous and extremely expensive for Plaintiffs and the Individual Defendants alike. Completing fact and expert discovery, briefing summary judgment motions, conducting a trial before a jury, and filing and defending appeals would span over many years and result in endless expenses. During that time, the Class would not recover a penny. And certainly, continuing the Litigation does not guarantee a victory or payment for the Class at

- 40 -

all.  In fact, the Individual Defendants are represented by experienced counsel, who would strongly represent their arguments and have the ability to exhaust every defense available to them.

147.  Based on all of the foregoing, and considering the Individual Defendants' defenses, which they would persistently argue through the remainder of the Litigation, Lead Counsel and Plaintiffs are confident that the Settlement of $46 million in exchange for the terms as set forth in the Stipulation, is reasonable, fair, and in the best interest of the Class.

### D.    The Plan of Allocation

148.  The Net Settlement Fund will be distributed to Class Members who submit a timely and valid Proof of Claim and would receive a distribution of at least $10.00.  The objective of the Plan of Allocation is to equitably distribute proceeds from the Net Settlement Fund to Class Members who allegedly suffered economic losses as a proximate result of the alleged wrongdoing.

149.  Lead Counsel, in coordination with Dr. Feinstein, developed the Plan of Allocation.  For a Class Member to have a Recognized Claim Amount, shares of Mallinckrodt common stock must have been purchased or otherwise acquired during the Class Period, between May 3, 2016 and March 13, 2020, and held through at least one of the alleged corrective disclosures on April 30, 2019, May 21, 2019, August 6, 2019, March 3, 2020, or March 16, 2020.

4905-3886-5698.v1

150.    As set forth in the Notice, all Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Proof of Claim and all required information, postmarked or submitted online, no later than April 14, 2025.  As provided in the Notice, after deduction of taxes, approved costs, attorneys' fees and expenses, and awards to Plaintiffs, the Net Settlement Fund will be distributed, according to the Court-approved Plan of Allocation, to Authorized Claimants who are entitled to a distribution of at least $10.00.

151.    The Court-approved Claims Administrator, Verita Global, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based on each Authorized Claimant's total Recognized Claim Amount compared to the total Recognized Claim Amounts of all Authorized Claimants.  Plaintiffs' losses will be calculated the same way.

152.    Lead Counsel, based on extensive experience in the Litigation and other securities class actions, believes that the Plan of Allocation provides a fair and reasonable method for equitable distribution of the Net Settlement Fund among the Authorized Claimants.

153.    To date, no Class Member has objected to the proposed Plan of Allocation.  Lead Counsel submits that the Plan of Allocation is fair and reasonable and should be approved.

- 42 -

4905-3886-5698.v1

**E.    Lead Counsel's Requested Award of Attorneys' Fees and Expenses Is Reasonable**

154.    Lead Counsel respectfully requests that the Court award one-third (33-1/3%) of the Settlement Fund for attorneys' fees.  Lead Counsel believes such a fee is reasonable and appropriate in light of Lead Counsel's commitment, resources, and risks of nonpayment from representing the Class on a contingent basis.  Lead Counsel further requests an award of $970,949.13 in litigation expenses, plus the interest earned thereon.

155.    As detailed in the accompanying application for attorneys' fees and expenses, there are a number of factors to consider when determining a fair fee.  These factors include the contingent nature of the fee, the time and labor Lead Counsel expended, and the difficulties which were overcome by obtaining the Settlement.

156.    Indeed, Plaintiffs' Counsel prosecuted the Litigation on a contingent fee basis – fully assuming the risk of an unsuccessful result – and committed 8,218 hours of attorney and professional time and incurred $970,949.13 in expenses as set forth in the accompanying Declaration of Michael G. Capeci Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Fee and Expense Declaration") and Declaration of James E. Cecchi Filed on Behalf of Carella, Byrne, Cecchi, Brody & Agnello, P.C. ("Carella Byrne Fee and Expense Declaration").  As such, Lead

- 43 -

Counsel has not received any compensation for its services during the Litigation and has incurred significant expenses in pursuing the Litigation for the Class's benefit.

157.    Counsel's pursuit of the Litigation on a wholly contingent basis, despite facing significant risk and determined opposition, justifies awarding a reasonable percentage fee based on the benefit conferred and common fund obtained for the Class.

158.    Counsel fully assumed risking an unsuccessful result in the Litigation and any fees or expenses awarded to have been entirely uncertain.  The only certainty from the inception of the Litigation was that Plaintiffs' Counsel would not receive any fee without successfully pursuing the Litigation after lengthy, complex, and difficult effort.

159.    Securities class action lawsuits are expensive to litigate and these fees are used to fund sizeable overhead expenses in pursuing years-long litigation, are taxed by federal and state authorities, fund expenses of other contingent cases, and assist in paying the salaries of counsel's attorneys and staff members.

160.    Plaintiffs' Counsel have substantial experience representing investors in securities class action cases.  The identification and background of the firms and their partners are attached as Exhibit F to the Robbins Geller Fee and Expense Declaration and Exhibit C to the Carella Byrne Fee and Expense Declaration.

4905-3886-5698.v1

161.    Plaintiffs' Counsel diligently prosecuted the Litigation and overcame complex factual and legal issues throughout its course – including during motion practice, class certification, at discovery, during Mallinckrodt's bankruptcy proceedings, and other issues which arose.    More specifically, Lead Counsel conducted considerable investigation and analyses into the Litigation, including investigating SEC filings, conference calls, analyst reports, third-party materials, and media.    Lead Counsel also conducted significant legal research and composed memoranda and briefs such as opposing the motion to dismiss, moving for class certification, and moving to strike the Individual Defendants' expert, and conducting substantial fact discovery.    Lead Counsel composed voluminous and comprehensive mediation statements and prepared and participated in the multiple day mediation sessions.    Lead Counsel also worked on the Settlement itself.

162.    In addition, Lead Counsel retained highly qualified and respected local counsel, Carella, Byrne, Cecchi, Brody & Agnello, P.C. ("Carella Byrne"), to serve as local counsel to Plaintiffs and the Class when the Litigation was transferred to this Court by the New York Court.    Among other things, Carella Byrne has provided substantial insight and guidance to Lead Counsel regarding local practices and procedures in this Court.    Carella Byrne also participated in Plaintiffs' appearances before this Court during the Litigation.

- 45 -

4905-3886-5698.v1

163. The fee request is also reasonable when cross-checked against Plaintiffs' Counsel's lodestar to date.

164. The number of hours spent on the Litigation by Plaintiffs' Counsel is 8,218. A breakdown of the lodestar is provided in Exhibit A to the Robbins Geller Fee and Expense Declaration and Exhibit A to the Carella Byrne Fee and Expense Declaration. The lodestar amount for attorney/paraprofessional time is $5,284,550.00, which translates to a multiplier of approximately 2.90 if the one-third attorneys' fee request is granted by the Court.

165. Lead Counsel's efforts and highly-skilled securities class action attorneys led to this excellent recovery for the Class. In fact, Lead Counsel is among the most experienced securities practitioners in the country. In evaluating the quality of Lead Counsel's work, it is important to acknowledge the quality of opposing counsel – Hogan Lovells US LLP. Hogan Lovells is among the nation's largest and most well-respected defense firms and has a reputation for vigorous advocacy in securities class action defense. In fact, Hogan Lovells served as counsel to Mallinckrodt in the SEC Action, and was able to secure a $0 penalty for Mallinckrodt and the Individual Defendants. Lead Counsel's ability to obtain a favorable settlement in the face of defense counsel's strong opposition confirms Lead Counsel's excellent representation.

4905-3886-5698.v1

166.    In light of this, and the other factors described in the accompanying memorandum in support of motion for approval of the fee award, Lead Counsel and Plaintiffs believe one-third of the Settlement Amount, plus expenses and interest, is a fair and reasonable fee for Lead Counsel under the circumstances.

167.    To date, no written objections have been filed by any potential Class Member to the fee and expense request.

### b.    The Requested Expenses Are Fair and Reasonable

168.    Plaintiffs' Counsel seek an award of $970,949.13 in expenses in connection with the prosecution of the Litigation.  Those expenses and charges are summarized by category in Exhibit B to the Robbins Geller Fee and Expense Declaration and Exhibit B to the Carella Byrne Fee and Expense Declaration.  These expenses are reflected in the books and records maintained by each firm.

169.    The expenses are reasonable and were necessary for the successful prosecution of the Litigation.  Plaintiffs' Counsel are aware that they would not recover any of these expenses unless and until the Litigation was successfully resolved.  That said, Plaintiffs' Counsel took steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of Plaintiffs' claims.

170.    Plaintiffs' Counsel's expenses reflect routine and typical expenditures incurred in the course of litigation, such as the costs of travel, investigation,

document duplication, document management, transcript fees, expert fees, consultant fees, expenses incurred by Canadian Elevator, mediation fees, and expedited mail delivery. These expenses are reasonable and were necessary for the successful prosecution of the Litigation.

## IV.   PLAINTIFFS SEEK AN AWARD PURSUANT TO 15 U.S.C. §78u-4(a)(4) BASED ON THEIR REPRESENTATION OF THE CLASS

171.   The PSLRA limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class[.]" The PSLRA further states, "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. §78u-4(a)(4).

172.   Lead Plaintiff Canadian Elevator requests an award of $10,000, and Sunrise requests an award of $8,250, to compensate them for their time and expenses related to their active participation in the Litigation. *See* Declaration of Gregory Manion, ¶¶12-13; Declaration of David Williams, ¶12. Courts regularly approve reasonable payments to compensate representatives such as Canadian Elevator and Sunrise for the time and effort they devote on the Class's behalf.

173.   Canadian Elevator participated in reviewing the Amended Complaint, other motions and documents filed by Lead Counsel in the Litigation and in

- 48 -

Mallinckrodt's bankruptcy proceedings, monitoring Mallinckrodt's bankruptcy proceedings, consulting with Lead Counsel regarding bankruptcy, litigation, and settlement strategy, participating in the mediation process, and reviewing the amount of attorneys' fees and expenses that Lead Counsel intended to request in connection with the Settlement, among other things.

174.   Likewise, since intervening in the Litigation, additional named plaintiff Sunrise has similarly participated.  Among other things, Sunrise has reviewed Court filings, searched for and produced documents, prepared for and was deposed by defense counsel, participated in the mediation process, and stayed in constant communication with Lead Counsel.

175.   As a result of the active participation by Canadian Elevator and Sunrise in the Litigation and on behalf of the Class, and as set forth more fully in the accompanying fee memorandum, Plaintiffs' award requests should be granted in their entirety.

## V.   CONCLUSION

176.   For all of the foregoing reasons and those in the accompanying Settlement and Fee Memoranda, Lead Counsel respectfully submits that the Settlement and Plan of Allocation should be approved as fair and reasonable.  In addition, as a result of the recovery obtained in the face of substantial risk, including the contingent nature of the fees and the complexity of the case, Lead Counsel

- 49 -

respectfully submits that the Court should award attorneys' fees in the amount of one-third of the Settlement Amount, plus $970,949.13 in expenses, plus the interest earned thereon at the same rate and for the same period as that earned on the Settlement Fund until paid, plus an award to Canadian Elevator of $10,000 and an award to Sunrise of $8,250.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of March, 2025, at Melville, New York.

_____
MICHAEL G. CAPECI

- 50 -

4905-3886-5698.v1